439 So.2d 1278 (1983)
SECURITY MUTUAL FINANCE CORPORATION
v.
Jerry WILLIS & Leon Willis d/b/a Valley Motors.
No. 53948.
Supreme Court of Mississippi.
November 2, 1983.
*1279 John M. Creekmore, Carnathan & Malski, Amory, for appellant.
Guy W. Mitchell, Mitchell, McNutt, Bush, Lagrone & Sams, Tupelo, for appellees.
Before PATTERSON, C.J., and BOWLING and ROBERTSON, JJ.
PATTERSON, Chief Justice, for the Court:
Security Mutual Finance Corporation (Security) sued Jerry Willis and Leon Willis, d/b/a Valley Motors (Valley), in the Circuit Court of Lee County for breach of contract. Security had purchased retail installment sales contracts from Valley and sought repayment for the deficiency caused by a customer's default. The jury verdict did not include a deficiency but rather awarded Valley $9100 as sought in its counterclaim. Security appeals.
Security is a finance corporation which regularly purchases retail installment sales contracts. It had done business with the Willises beginning in 1976 by the purchase of contracts from Willis Brothers Motor Company, Inc., in Tupelo and when Valley was opened in Water Valley in 1978, they purchased retail installment contracts from the business in that location as well. This relationship continued until Valley closed its business on October 31, 1979.
The contract leading to this dispute concerned the sale of a 1974 Ford Mustang to Beulah Potts by Valley on June 8, 1979. The price of this automobile was $2,729.00 *1280 of which Potts made a down payment of $329.50 and arranged financing over 24 monthly payments of $129.25 each.
Valley sold this contract to Security for $2350.00 and it then became Security's responsibility to collect the installment payments. The contract was assigned with recourse inasmuch as it contained a limited repurchase clause which provided that payment was guaranteed by Valley for six months. This provision meant that Valley was to pay Security the unpaid balance on the account and repurchase the car if Potts defaulted during the first six months.
The July, August, September and October, 1979 payments were made but the November and December payments fell into arrears and Security repossessed the automobile in January of 1980.
The Mustang was inoperable because of engine problems when repossessed. It was transported to the site of Willises' automobile operation in Tupelo where it was presented to Jerry Willis with a request by Security that the balance, $1711.22, be paid in accord with the contract. Willis declined to pay but offered to sell the car and apply the proceeds on the balance. Security believing the contract required payment in full, refused Valley's offer. The Mustang was then taken back to Grenada where it was sold for $488.00.
The Mustang was not appraised before sale, neither was it cleaned nor vacuumed. Security merely took three bids (from parties with whom they had business relations), and accepted the highest bid. The testimony elicited by the defendant was that the sale price was unreasonably low. There was evidence by the Willises and Jerry Nolan, another automobile dealer, that the reasonable value of the car, with the bad engine, was between $1300.00 and $1800.00.
Additionally, Valley objected to Security's request for the deficiency which resulted after the $488.00 from the sale was credited to the account. In its counterclaim Valley alleged that Security maintained a loss reserve account and a deferred advance account to offset losses incurred upon repossession of merchandise. Valley contends the loss reserve account was financed by deducting 10% of the finance charge on each loan and the deferred advance account deducted $50.00 from each transaction. It further alleged these monies came from the sum the sellers would have received but for the accounts and was intended to protect both parties in the event of default.
Security argued that Potts' contract specifically required Valley to pay the balance due if there was a default before the first six payments were made, maintaining that the loss reserve and deferred advance accounts were available only after that time. Security therefore objected to evidence concerning these accounts, because the specific recourse agreement was in effect at the time of default.
Although Jerry Willis testified for Valley that the reserve accounts applied to a default within the first six months after a contract was assigned, he nevertheless admitted there was no such contractual provision having application to this sale. Leon Willis corroborated his brother in testifying that this use of funds was merely an understanding. He acknowledged that loss by default was Valley's responsibility during the first six months after a loan was made but added that it was his impression that the revenue accounts would be used on such things as the Potts' default. He felt the business in Water Valley would be done as he asserted it had been done in the Tupelo business. This meant, as we comprehend his testimony, that Leon Willis expected the repossessed automobiles to be sold for the highest sum possible and that the reserve accounts would then cover the deficit, whereby Valley would never be liable for any deficiency. He acknowledged, however, that the contract did not have such provision and reiterated that it was only his impression the reserve accounts would be applied to Potts' default.
At the time of the final posting on October 17, 1979, the reserve accounts from all sales contained adequate funds to pay the Potts' deficit. Funds were not taken from either account by Security for the deficiency because of the recourse provision that *1281 Valley would repurchase the car if default occurred during the first six months. Valley sought different treatment according to Leon Willis who stated, "... this is what I asked them to do and what we told them we would do ...". Yet, nevertheless, he admitted that such was not in accord with the contract. Security did not agree to any modification, and as mentioned, sought payment in accord with the six months provision.
Over objection, the jury was permitted to consider the loss reserve and deferred advance accounts, which was contrary to the contractual language excluding the application of such accounts for defaults within the first six monthly payments. The jury's verdict found Security liable to Valley for $9100.00 of the reserve accounts.
Among its assignments of error, Security contends the trial court erred in receiving parol evidence concerning such accounts.
Fuqua v. Mills, 221 Miss. 436, 73 So.2d 113 (1954), addresses the use of parol evidence to modify the express written provisions of a contract.
The rule relating to the admission of parol evidence to add to or contradict written instruments is stated in 32 C.J.S., Evidence, § 851, page 784, as follows:
"It is a general rule that parol or extrinsic evidence is not admissible to add to, subtract from, vary, or contradict judicial or official records or documents, or written instruments which dispose of property, or are contractual in nature and which are valid, complete, unambiguous, and unaffected by accident or mistake. This rule, which is known as the parol evidence rule, is one of substantive law and not merely one of evidence; and it obtains in equity as well as at law."
In the case of Kendrick v. Robertson, 145 Miss. 585, 111 So. 99, 101, the Court * * * said:
"* * * the rule that the terms of a written contract or conveyance cannot be varied or added to by parol evidence is not merely a rule of evidence, but is one of substantive law, and, in measuring the rights of the parties to a written contract or conveyance, which, on its face, is unambiguous and expresses an agreement complete in all of its essential terms, the writing will control. Jones, Commentaries on Evidence, vol. 3, par. 434; Wigmore on Evidence, vol. 4, pars. 2400 and 2425."
In the case of Edrington v. Stephens, 148 Miss. 583, 114 So. 387, the Court reaffirmed the rule stated above, and again held that the terms of a written contract could not be varied or added to by parol evidence.
73 So.2d 118-19.
The written provisions adopted by contracting parties merge only those prior and contemporaneous writings which are contained within as the final and complete expression of their agreement. Fortune Furniture Manufacturing, Inc. v. Pate's Electronic Co., 356 So.2d 1176, 1178 (Miss. 1978). "Where parties, without any fraud or mistake, have deliberately put their contract in writing, the writing is not only the best, but the only evidence of their agreement." Ralston Purina Co. v. Rooker, 346 So.2d 901, 903 (Miss. 1977); Noble v. Logan-Dees, Chevrolet Buick, Inc., 293 So.2d 14, 15 (Miss. 1974). This does not mean, however, that a separate contract may not be entered into to explain or supplement the existing contract. Bell v. Hill Bros. Construction Co., Inc., 419 So.2d 575, 576-77 (Miss. 1982).
This is consistent with our statutory scheme as well as prior cases of this Court. Miss.Code Annotated, § 75-2-202 (1972), provides that:
Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
(a) by course of dealing or usage of trade (Section 1-205) [§ 75-1-205] or by course of performance (Section 2-208) [§ 75-2-208]; and

*1282 (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.
It would seem that the Potts' contract and its assignment to Security stands alone, such that the conduct of business operations in Tupelo, which was not explained at trial in any detail, would not affect the agreement between Valley, a separate business, and Security. We therefore think the course of business in Tupelo does not govern the contract here. Although the different companies were owned by the Willises the course of conduct claimed in modification of the Valley contract was antecedent to the written agreement. The contract does not contain language evincing any intention to permit the use of the deferred or reserve accounts if default occurred before the first six payments were made. We, therefore, conclude the whole agreement between the parties is expressed in the written contract. It necessarily follows that there was error by the trial court in admitting the parol testimony regarding the reserve account, since this was precluded by the recourse agreement concerning payments within the first six months. Stated differently, the parol evidence was not in explanation of or supplementary to the contemporaneous writing but rather was contradictory to it.
Undoubtedly this testimony led the jury to award the Willises, d/b/a Valley, the $9100 contained in the deferred advance account. We are of the opinion the jury should not have considered this testimony on the Potts' contract and assignment for the reasons above stated and that it was also erroneously introduced under the counterclaim because that contract[1] was exhibited to it and by its plain terms, includes the same recourse agreement. Assuming, for the moment, that there was a course of business conduct in explanation of the Tupelo business and the contract there, nevertheless such was not evidenced in any detail sufficient to overcome the written agreement. We therefore hold that the verdict of $9100 is erroneous.
We note there appears to be a valid issue of the reasonableness of the sale of the Mustang after Potts' default which should be considered on retrial.
REVERSED AND REMANDED.
WALKER and BROOM, P.JJ., and ROY NOBLE LEE, BOWLING, HAWKINS, DAN M. LEE, PRATHER and ROBERTSON, JJ., concur.
NOTES
[1] See Miss. Code Ann., Section 11-7-47. The writing was filed and made part of the record.